MEXICAN CENT. RY. CO. v. WILDER.

(Circuit Court of Appeals, Fifth Circuit. March 4, 1902.)

No. 1,073.

1. APPEAL.—REVIEW—HARMLESS ERROR.
    Where a railroad company by plea tendered an issue as to the condition and inspection of its roadbed and track, and evidence on the subject was introduced by both parties without objection, it was not prejudicial error for the court, over defendant's objection, to permit an engineer who had been employed on the road at the time referred to to testify that it was common for him to receive orders at terminal stations to look out for broken rails.

2. SAME—QUESTIONS NOT PRESENTED TO TRIAL COURT.
    Defendant railroad company pleaded a release in defense to an action for a personal injury, and plaintiff in his replication admitted the signing of the same, but denied its validity. It did not appear from the record that the release was introduced in evidence, that any evidence was taken with reference to it, or that it was in any manner brought to the attention of the court. Held, that in such state of the record the appellate court would not consider an assignment of error based on the failure

of the trial court to make such release the basis of a special instruction directing a verdict for defendant.

In Error to the Circuit Court of the United States for the Western District of Texas.

T. A. Falvey and Waters Davis, for plaintiff in error.

Thomas J. Beall and Wyndham Kemp, for defendant in error.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

PER CURIAM. This is a suit brought by Halbert Wilder to recover damages from the railway company for personal injuries sustained by him about March 17, 1900, through the derailment, near Puerto Hill, in the state of Chihuahua, republic of Mexico, of one of the railway company's freight trains on which Wilder was employed as a brakeman. It was charged that said train broke or struck a broken rail, about six feet of which was thrown out of place; that said rail was old and worn; that the cross-ties thereunder were old and out of repair, thereby causing the derailment aforesaid. The railway company answered with a general denial, and a plea to the effect that the plaintiff's injuries resulted through one of the risks incident to his employment, and that the railway company's track and roadbed were properly constructed, inspected, and maintained, and that the rails and cross-ties of said company's track were of good and suitable quality; that said rails were to all appearance good and sufficient for the purpose, and no inspection could have determined or discovered any vice or fault therein; that caution and prudence were exercised in keeping in condition and inspection; and that the accident was fortuitous, without fault or neglect on the part of the railway company. And for a further plea the railway company pleaded a written agreement entered into by Wilder whereby he relinquished all his right and claim to damages for a valuable consideration, and to the said plea annexed a copy of a written release, purporting to be signed by Wilder and witnessed by the surgeon in charge of the railway company's hospital, and executed the 21st of May, 1900, wherein it is recited as follows:

"For and in full release, discharge, and satisfaction of all claims, demands, or causes of action arising from or growing out of an accident occurring at kilometer 1,727 on the Chihuahua division of the Mexican Central Railway, March 17, 1900. While riding on caboose, car was derailed by broken rail, turning over, causing injuries to head, producing concussion of the brain. Received of the Mexican Central Railway Company, Limited, one dollar in full payment of above claim ($1.00). In consideration of the payment of said sum of money, I, Harry Wilder, of Fairfield, state of Iowa, United States of America, hereby remise, release, and forever discharge the company of and from all manner of actions, causes of action, suits, debts, and sums of money, dues, claims, and demands whatsoever, in law or equity, which I ever had, or now have, against said company, by reason of any matter, cause, or thing whatever, whether the same arose upon contract or upon tort."

To this last-mentioned plea Wilder filed a replication, denying that the company's track and roadbed were properly inspected and maintained, and admitting his signature to the release, but alleging that at the time of—

"* * * the execution of said instrument he was suffering from the severe injuries which he had sustained through the negligence of the defendant company in his back and spine and head, and that he was so enfeebled in mind and body at the time of the execution of instrument that he was incapable of understanding the contents of said instrument, if the same was read to him, which he does not now remember; that he is informed and believes, and so charges, that he was in a condition of unconsciousness for several weeks after he was injured, and while confined to his bed in the hospital of the defendant company in the city of Chihuahua, Mexico; that the said instrument of release referred to was presented to him by the company's physician, in whose charge he was a patient, being treated, as he is informed and believes, for concussion of the brain, from which he has not entirely recovered; and plaintiff charges and avers that the execution of said instrument at the time, in the manner and under the circumstances, was a fraud upon his rights, and was and is without any sufficient consideration to support it. Plaintiff avers that, owing to his enfeebled condition of mind on the date of the execution of said instrument, he did not know or realize the extent of his injuries, both physical and mental, and that the same were continuing and permanent. Wherefore plaintiff says that said instrument so signed by him, under the conditions and circumstances aforesaid, was procured by fraud, as aforesaid, and ought not to be held to bar the plaintiff's action."

On the trial of the case, as shown by first bill of exceptions, several witnesses were examined on behalf of plaintiff and for the defendant in the court below touching the condition of the railway company's track at the place where the accident occurred, and as to the general condition of the track in the neighborhood, all apparently without objection. Among other witnesses called was one George A. Lambeth, for the plaintiff, who was examined, cross-examined, re-examined by the plaintiff, recross-examined, re-examined again by the plaintiff, and recross-examined, and subsequently was recalled and re-examined by the plaintiff, recross-examined, twice again re-examined, and again recross-examined. In his evidence he testified, apparently without objection, among other things, as follows:

"I had been running on the Mexican Central Railway as engineer between four and five years. I know where kilo 1,732 is on the Chihuahua division. It is about six kilometers this side of Puerto,—north of Puerto. I had been running over that piece of road as engineer, off and on, ever since been with the company,—between four and five years. I was well acquainted with the condition of the roadbed, ties, and track at that place,—that kilo,—I guess. I was no more familiar with kilo 1,732 than any other part of the road. I had been running over it off and on between four and five years. The rails that were on that kilo were steel rails, 56 pounds to the yard,—56 pounds steel. I do not know just how long those rails had been in use, except ever since the track was laid there. The rails on the line of the road at that place were old ones. As to the condition of the ties just under that particular rail I could not say. I passed two or three days after the wreck, and it looked to be in a bad condition. The ties were badly decayed. I passed on the 20th, the third day after the wreck occurred. I saw where the wreck occurred, and the ties were pretty badly decayed. On every trip at terminals we got orders to look out for broken rail on every kilo. That would be the nature of the order we would get. That was common, and included this kilo."

Cross-examination:

"I mean that I would get orders at the different terminals to look out for broken rail on 1,750, another time for kilo 1,872, etc.,—different kilos on the same section of the road,—not that this kilo was any worse than any others, but that the whole track from here to Chihuahua was in bad condition.

They had the same kind of rails from here to the end of this division at that time,—56 pound rails. The rails for the whole division were apparently of the same age, in the same condition. I did not make any complaint about this kilo merely, but the whole division was in about the same condition. We would strike places where the ties were not so bad. This kilo (1,732) was no worse than any of the others,—all bad. I was not any more familiar with this kilo than any other kilo. When running over it I could not discern that it was any worse than any of the rest. If I ever got an order to look out for any broken rail on kilo 1,732, I cannot remember the date, but it was issued over the road master's signature. I do not know that I ever got an order to look out for a broken rail on that particular kilo. * * *"

### Recross-examination:

"I passed by there three days after the accident on an engine. They had put on new ties before I got there. The engine and cars had torn up the others.—ground them up considerably. The ties were crumbled up where they were decayed. I cannot say they had new rails in before I got there. Probably a different rail had been taken from a side track to repair it. I reduced speed down to a very slow walk—probably to three or four miles an hour—where the wreck had occurred. I did not stop to inspect the place,—just what I could see from my engine."

### Redirect examination:

"The ties that were there as I saw them were rotten. * * * The ties that were thrown out from the place of this wreck were all rotten. They seemed to extend from where the wreck began to where it stopped. They repaired the track entirely all along, and put in new ties, but they seemed to be in about the condition it was, I could see. The ties seemed rotten all along the track. I could only see, as I passed over where they were taken out, where the good ones had been put in, but they seemed to be rotten where they were thrown out. Their condition was all rotten, it seemed to me. They had a little crust over the top of them where the sun had shone on, but underneath that, say 1½ inches, they were all rotten at the ends. That extended the whole distance. I was traveling at a rate of speed that I could see the condition of the ties just as well as if I was walking along. Of course, I could not see right down under the engine, but I could see ahead, and see how the track was being repaired, and how it was being got in line."

### Cross-examination:

"I could not tell the particular place where the rail broke. I do not know the condition of the ties under the particular place where the rail broke. I could only tell from the condition of the ties thrown out. They had repaired right over where the cars jumped the track. I do not know where the rail was broken, but where the cars jumped the track. They had repaired the ties from the rails where the wheels of the cars got off the irons and on to the cross-ties. I could not tell where the cars got off the track. Every tie apparently had been ground up and thrown out. It seems to me that all the ties, commencing where they began to be broken up by the wheels of the cars, had been thrown out, but I could not say positively. Under the circumstances. I could not observe so closely as to be able to say. It seemed to me as if all the ties had been removed. I could not tell about what was the number. The whole mass was piled up, and I could not tell whether they had ever been in there or not. I do not know the condition of the broken rail, or the condition of the ties underneath the broken rail. I could not say whether the ties under it were removed or not."

### Redirect examination:

"I do not know where that particular rail broke, nor where the particular broken rail was, but where the track had been repaired up all along the line. I was coming north. Of course, I could see where they had commenced repairing the track and where it ended. I could not see where the new rail had commenced. As I came on, the ties at the north end right

opposite that place were in about the same condition. In fact, the north section they were about all the same condition. You could not say just how they were, because the top of the ties seemed to be sound when not more than an inch below. They were simply dry on top, but underneath were rotten, and by just passing over it with your finger you could see whether they were sound or not; but you could get down—I have very often done that—to pick the spikes out. I could not tell whether these ties right opposite the place where they had been repairing on the north end were decayed or not. The ones taken out were all rotten. They would not have left them in while rotten. They were nothing but dust. They extended up to where I could see the new rails commenced. The ties they had taken out were rotten. They were all broken into dust. I could not tell you they had been ties. They extended the whole length, from the beginning to the end. They had been thrown backwards and forwards, and you could not tell just where they came from. That was their general appearance,—general condition. To all appearance, in passing right over them, they appeared to be sound, but only about an inch and half before you would find that the ties were decayed. The top of the ties where the sun had come out and dried it after the rains would leave a crust on top, but underneath that the ties,—there was nothing underneath them; all of the rest of the tie appeared to be rotten. Those extending along the sides—extending from the new rail— were all rotten."

A second bill of exceptions shows that some time during the examination of the said George A. Lambeth he was asked by the plaintiff's counsel the following question:

"About the time and before this wreck occurred I will ask you with reference to the condition of the rails that you say had been in use so long, as to whether there was any other breaking of rails, whether that was common or uncommon, and what your orders were with respect to running over the road, if you had any?"

The defendant objected to this question, assigning as a reason that it was not competent to prove other accidents and notice with reference to the breaking of other-rails at different times and places; but the objection was overruled, and the witness permitted to answer, and did answer, as follows:

"A. I had such instructions,—got them at every trip. At terminals we got orders to look out for broken rail on every kilo. That would be the nature of the order we would get. Q. Was that common? The Court: Did that include this kilo? A. Yes, sir."

This ruling of the court was duly excepted to, and is the substance of the first assignment of error in this case. Considering that the railway company by its plea tendered an issue as to the condition and inspection of its roadbed, and that evidence was offered in relation thereto by both plaintiff and defendant unobjected to, we are inclined to the opinion that the ruling of the court admitting this particular question propounded to witness Lambeth, and the answer thereto, was correct; but, whether correct or not, we are satisfied that, in the mass of evidence offered on both sides on the condition of the railway company's roadbed, the admission of the answer to the question propounded to Lambeth did not prejudice the railway company to any appreciable extent.

The only other assignment of error in the case is as follows:

"(2) The court erred in submitting this cause to the jury, and erred in refusing to give defendant's special charge wherein it asked the court to instruct for defendant, for the reason that under plaintiff's allegations the negligence of defendant in having rotten ties in its track was the basis of plain-

tiff's claim, and for the reason that the testimony wholly failed to establish this allegation or to show that plaintiff was entitled to recover a verdict herein, as shown by defendant's last bill of exceptions."

Counsel contends that the court erred in submitting this case to the jury, because no explanation or avoidance of the recital and release pleaded in the railway company's first amended original answer was proven by the plaintiff, counsel contending that the plaintiff had relieved the defendant of the necessity of any proof of this instrument by admitting that he had signed the same in the replication filed to the first amended original answer. The record does not show that the defendant offered said release in evidence, and no reference appears to have been made to it during the trial either in the evidence offered or in the charge of the court, nor in the motion for a new trial, nor in the special instructions asked for by the defendant. Not having been offered in evidence by the defendant, nor in any wise called to the attention of the court and jury on the trial, we are of opinion that no error can be predicated upon the failure of the court to make it the basis of a special instruction to find a verdict for the defendant. While not offered in connection with the release, there was undisputed evidence showing that at the date of the release Wilder was in no condition of mind and body to make a valid contract.

We have herein recited enough of the evidence adduced on the trial to show that the negligence vel non of the railway company in maintaining its track was properly submitted to the jury.

The judgment of the circuit court is affirmed.